IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| **Steven R. Isaac**<br>2473 Milligan Grove<br>Grove City, Ohio 43123<br><br>and<br><br>**Earl Gallegos**<br>7171 Tradition Cove Lane<br>West Palm Beach, FL 33412<br><br>and<br><br>**Richard Freeman**<br>12697 N. 84th Place<br>Scottsdale, AZ 85260<br><br>Plaintiffs<br><br>v.<br><br>**Ebix, Inc.**<br>5 Concourse Pkwy, Suite 3200<br>Atlanta, GA 30328<br><br>Defendant | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | CASE NO. 2:11CV450<br>EAST. DIV. COLUMBUS<br><br>JUDGE JUDGE GRAHAM<br><br>MAGISTRATE JUDGE<br>MAGISTRATE JUDGE ABEL<br><br><br><u>COMPLAINT</u><br><br><br>**(JURY DEMAND ENDORSED<br>HEREON)** |

Plaintiffs Steven R. Isaac, Earl Gallegos, and Richard Freeman (collectively "Plaintiffs") for their Complaint against Defendant Ebix, Inc. ("Ebix"), hereby state as follows:

**PARTIES**

1. Plaintiff Steven R. Isaac is an Ohio citizen residing at 2473 Milligan Grove, Grove City, Ohio 43123.

2. Plaintiff Earl Gallegos is a Florida citizen residing at 7171 Tradition Cove Lane, West Palm Beach, Florida 33412.

3. Plaintiff Richard Freeman is an Arizona citizen residing at 12697 N. 84th Place, Scottsdale, Arizona 85260.

4. Ebix is a Delaware corporation with a principal place of business located in the state of Georgia.

## JURISDICTION AND VENUE

5. This Court has jurisdiction over this claim under 28 U.S.C. § 1332, as this is a civil action involving damages in excess of $75,000 between parties with citizenship in different states.

6. Venue is proper in the Southern District of Ohio, Eastern Division, pursuant to 28 U.S.C. § 1391(a) because a substantial part of the events giving rise to Plaintiffs' claims occurred within the Southern District of Ohio.

## BACKGROUND FACTS

7. In 2009, Plaintiffs were the sole shareholders of a Delaware corporation known as Peak Performance Solutions, Inc. ("Peak"). During all periods relevant to this Complaint, Peak has been located at 10639 Welch Rd., Orient, OH 43146.

8. On September 30, 2009, Plaintiffs and Ebix executed the Stock Purchase Agreement attached hereto as Exhibit A (the "Agreement").

9. In consideration for purchasing all of the outstanding capital stock of Peak (the "Stock"), Ebix agreed to pay the Plaintiffs, among other things, (1) the initial purchase price of Eight million dollars ($8,000,000); (2) an Earn-Out based on Peak's revenue during the calendar year of 2010 potentially ranging from $0-$1,500,000; and (3) the value of all accounts receivable owed to Peak as of September 30, 2009 (the "Pre-Closing Receivables.") See Agreement § 1.2.

10. After paying the initial purchase price and receiving the Stock from Plaintiffs, Ebix has systematically and repeatedly breached the Agreement to the prejudice of Plaintiffs. As explained in detail below, Ebix: (1) failed to provide certified financial statements showing Peak's performance as required by the Agreement; (2) failed to institute appropriate accounting policies which would allow Plaintiffs or any other third party to properly audit Peak's performance; (3) interfered with Plaintiff's opportunity to achieve the Earn-Out by (a) firing Ohio employees of Peak and (b) prohibiting Peak from selling products to customers in direct violation of the parties agreements; (4) failed to collect Pre-Closing Receivables which were owed to Plaintiffs; (5) improperly imposed tax liability on Plaintiffs in violation of the parties agreements, and (6) fraudulently misrepresented several facts and Ebix's intentions in order to persuade Plaintiffs to enter into the Agreement.

I. **Ebix Has Failed To Provide Audited Financial Statements In Violation Of The Agreement.**

11. Section 1.2(b) of the Agreement states:

"(b) <u>Contingent Consideration</u>. Following the Closing, if the Revenues of the Company for the 2010 calendar year (the "Earn Out Period") are equal to or greater than $6,500,000, Buyer will pay to the Sellers an amount (the "Earn Out") as follows:

(i) if the Revenues of [Peak] for the Earn Out Period are equal to or greater than $6,800,000, [Ebix] shall pay to the [Plaintiffs] an amount equal to $1,500,000; or

(ii) if the Revenues of [Peak] for the Earn Out Period are equal to or greater than $6,500,000 but less than $6,800,000, [Ebix] shall pay to the [Plaintiffs] an amount equal to $ 1,000,000."

12. The Earn-Out was required to be paid "within 5 Business Days following the completion of [Peak's] audited financial statements for the Earn Out Period (but in no event later than 90 days after the end of the Earn Out Period)." See Agreement § 1.2(b). Accordingly, any Earn-Out was required to be paid by no later than March 31, 2011.

13. The Agreement also provides that "[a]long with payment of the Earn Out, if any, [Ebix] shall provide the [Plaintiffs] with (i) a certificate setting forth in detail [Ebix's] calculation of the Earn Out (the "Earn Out Certificate") and (ii) a copy of [Peak's] **audited financial statements** for the Earn Out Period." See Agreement § 1.2(b)(emphasis added). Accordingly, the Agreement requires that the audited financial statements be provided by no later than March 31, 2011.

14. Ebix did not provide Plaintiffs with audited financial statements for Peak by March 31, 2011.

15. Ebix did not pay Plaintiffs the Earn Out by March 31, 2011.

16. On or about April 5, 2011, Plaintiffs contacted Ebix and asked for a copy of Peak's audited financial statements.

17. In response to a letter from Plaintiffs, Ebix's CFO Robert Keris sent an email to Plaintiffs on or about April 21, 2011 attaching an Excel Spreadsheet which purported to be Ebix's Earn Out calculation. No audited financial statements or other supporting financial data were delivered with this email. Based on information and belief, as well as communications with Ebix's legal counsel and Ebix's Chief Financial Officer, this purported Earn Out calculation was also not audited by any third party.

18. On or about May 3, 2011, Plaintiffs contacted Ebix, objected to Ebix's breach of the Agreement, and once again requested a copy of Peak's audited financial statements. Plaintiffs demanded that Ebix provide audited financial statements which complied by the Agreement on or before May 9, 2011.

19. On or about May 9, 2011, Ebix's counsel called counsel for Plaintiffs in response to Plaintiff's May 3, 2011 letter. During this call, Ebix's counsel acknowledged that Ebix was

required to provide audited financial statements for Peak, and promised that Plaintiffs would be provided with a copy of Peak's audited financial statements within 24-48 hours.

20. Ebix did not provide a copy of Peak's audited financial statements within 24-48 hours.

21. On or about May 13, 2011, Plaintiffs' counsel once again called Ebix's counsel to ask about this missing financial statements. Once again, Ebix's counsel promised that the audited financial statements were coming, but this time he indicated that the information which had been provided to Plaintiffs was not audited by any third party, and that Peak's financial performance would need to be audited for the first time by a third party auditor. Ebix's counsel indicated that it would take several weeks for a third party auditor to create audited financial statements for Peak.

22. Despite Ebix's express obligation to provide these audited financial statements and repeated promises by Ebix that the audited financial statements would be provided, Plaintiffs have still not received a copy of Peak's audited financial statements.

23. Due to Ebix's failure to prepare audited financial statements for Peak as required by the Agreement, and due to Ebix other breaches of the Agreement, Ebix has failed to pay Plaintiffs the Earn Out that is owed under the Agreement.

## II. Ebix Does Not Have Proper Internal Accounting Controls And Bookkeeping Controls And Can Not Create Valid Financial Statements For Peak.

24. Section 1.2 of the Agreement requires Ebix to provide to Plaintiffs audited financial statements for Peak and Ebix's work papers relating to those financial statements. As discussed above, Plaintiffs have not provided audited financial statements for Peak to date. Plaintiffs have provided sufficient financial information to make clear that Ebix lacks appropriate internal accounting controls and cannot provide valid financial statements as required by the Agreement.

25. During the entire term of the Earn Out Period, Ebix's accounting procedures were plagued with errors. Ebix was consistently unable to properly bill customers, tie customer payments to invoices issued by Ebix on behalf of Peak, provide basic financial data, or calculate Peak's revenue during the Earn Out Period. Most importantly, Ebix did not maintain Peak as a separate legal entity with its own accounting controls, and instead merged Peak's operations into Ebix. As a result of this transition, Ebix is unable to provide audited financial statements for Peak, which is a violation of the Agreement.

26. Almost immediately after purchasing Peak from Plaintiffs, Ebix transferred Peak's billing function to Ebix employees who were unfamiliar with Peak's business and who it now appears were unable to properly account for Peak's operations.

27. As part of this transition, on October 1, 2009, Ebix fired 5 of Peak's employees, including Peak's sole financial and billing employee responsible for billing customers.

28. Once Peak's accounting employees were terminated, Peak began to suffer constant errors in Peak's billing and administrative processes. Ebix was consistently unable to properly produce invoices to customers in a timely manner. This led to customers complaining about Ebix's improper bills, and customers leaving Peak and doing less business with Peak because Ebix was unable to issue proper bills to those customers.

29. By way of example, Peak was to be retained by Sentury Insurance Company to provide certain services in 2010. Under the terms of this agreement, Peak was to receive approximately $7,500 per month for those services. However, as a result of a series of billing mistakes by Ebix employees, Sentury Insurance Company did not enter into this contract.

30. Ebix was made aware of these issues in November of 2009, only a month after closing, and failed to take any steps to correct this problem until well into 2010.

{01130107.DOC;5 }                                6

31. As a result of the significant billing problems caused by Ebix, Peak did not properly allocate sales and revenue into the appropriate accounting periods. As a result, upon information and belief Peak overstated its accounts receivable for the last quarter of 2009.

32. Also as a result of the significant billing problems caused by Ebix and the overstatement of revenue in the last quarter of 2009, Ebix reduced 2010 revenue to correct for its mistakes in late 2009.

33. As the Earn Out Period does not include the last quarter of 2009, upon information and belief Ebix is attempting to use the reduction in 2010 revenue as a result of Ebix's 2009 errors to reduce Peak's revenue for the Earn Out Period.

34. Once Ebix took Peak's billing function from Peak employees and fired Peak's accounting employee the day after the close of the transaction, Ebix also took responsibility for tracking customer payments.

35. Ebix was consistently unable to tie customer payments to specific invoices, and so Ebix was unable to determine which customers had made payment for which projects. As a result of Ebix's failure to account for customer payments, Ebix was unable to manage accounts receivable for Peak, and Ebix is unable to create and maintain accurate books and records for Peak.

36. Plaintiff Steven R. Isaac was employed as Sr. Vice President of Peak (now known as the Ebix Risk Division) after the Agreement was signed. As part of his employment, Mr. Isaac repeatedly requested basic financial information regarding Peak's performance and operations. Ebix was consistently unable to provide even basic accounting information to Mr. Isaac, and when it was able to provide information it was plagued with errors and inaccuracies.

37. On April 21, 2011, Plaintiffs received an unaudited spreadsheet from Ebix's CFO, Robert Ferris, which did not contain any supporting data. Mr. Ferris' spreadsheet was substantially flawed. Mr. Ferris failed to accurately reflect Peak's revenues for the Earn Out Period, failed to reflect the actual amount of revenue received from each customer, and actually indicated that the revenue from several customers was **negative** during the earn out period. Mr. Ferris calculated Peak's 2010 revenues as $5,875,220.

38. On December 16, 2010, Ebix's Controller, Sean Donaghy, provided his calculation of Peak's revenue for the calendar year 2010 through October of 2010. Mr. Donaghy supplemented this calculation with data for November and December of 2010 on April 21, 2011. Mr. Donaghy's combined calculation showed Peak's billings at $6,500,838, which included a $200,000 reduction to 2010 revenues that was based on a billing error by Ebix in the 4th quarter of 2009.

39. As shown by the foregoing, Ebix's own CFO and Controller are unable to agree on Peak's revenue for 2010, and in fact disagree by more than $800,000 over a one year period after taking into account Mr. Donaghy's $200,000 reduction on 2010 revenue based on 2009 errors.

40. Ebix's billing records offer yet another story of Peak's revenue. According to Ebix's billing records, during the Earn Out Period Peak billed its customers $6,656,107.54. If this number is accurate, then Ebix's CFO must explain why Peak is having such problems collecting its accounts receivable, and why Peak's revenue for the Earn Out Period was so low compared with Peak's billing Records. He must also explain why his calculation of 2010 revenue is so different from those of the billing records and Ebix's Controller. If the billing records are not accurate, it is yet more evidence that Ebix's internal accounting controls are simply ineffective.

41. The Agreement required Ebix to pay Plaintiffs the Earn Out based on Peak's revenue

for the calendar year 2010. Despite this requirement, upon information and belief Ebix did not maintain Peak as a separate operating entity for the year 2010. Instead, Ebix effectively merged Peak into Ebix, which had the effect of turning Peak into a division of Ebix.

42. By effectively merging Peak into Ebix, Ebix has made it impossible for an independent auditor to properly provide audited financial statements for Peak as a standalone entity.

43. Effectively merging Peak into Ebix also makes it impossible to determine what revenue belonged to Peak. While it is certainly appropriate to create consolidated financial statements from stand alone entities, Ebix's current financial statements simply show Peak's revenue as part of Ebix's revenue for the year 2010, leaving Plaintiffs and other interested parties to guess what revenue constituted organic growth by Ebix and what revenue arises from Peak and other acquisitions during the relevant period.

44. As shown by the foregoing and by additional information to be introduced at trial, Ebix does not have sufficient internal accounting controls to allow their books and records to be relied on, and accordingly has breached § 1.2 of the Agreement to provide reliable books and records to Plaintiffs.

### III. Ebix Breached The Agreement By Interfering With Plaintiff's Right To Receive The Earn Out.

45. Section 1.2(d) states:

"(d) Buyer Covenants. In order to provide the [Plaintiffs]with a reasonable opportunity to receive the maximum Earn Out available pursuant to this Agreement, following the Closing Date, [Ebix], [Peak] and their Affiliates, and their respective directors, stockholders, officers, partners, employees, successors and assigns, shall: . . . **(iii) refrain from diverting or otherwise causing any of [Peak's] current prospects or customers to instead do business with other divisions or entities controlled by [Ebix] or its Affiliates, at least through the end of the Earn Out Period; (iv) be subject to an express obligation of good faith and fair dealing with respect to the [Plaintiffs]; and (v) not do anything**

**to adversely affect the [Plaintiffs] opportunities to receive the maximum Earn Out available pursuant to this Agreement.**" (emphasis added)

46. Ebix breached Section 1.2(d) of the Agreement thereby deprived Plaintiffs of the opportunities to receive the maximum earn out and the maximum potential Earn Out to Plaintiffs.

### A.  Ebix Terminated Key Employees.

47. Soon after closing, Ebix fired 5 of Peak's key employees. It now appears that these terminations effectively ended Peak as an independent entity, because Peak no longer had the capacity to bill and service its existing customers.

48. It is also apparent now that these terminations severely harmed Peak's opportunity to reach the maximum possible earn out, because Peak no longer had the capacity to properly service its existing customers, to properly obtain new customers, or even to properly account for the customers which it did retain.

### B.  Ebix Misrepresented The Products Which It Would Allow Peak To Sell Post-Closing.

49. Ebix also breached Section 1.2(d) of the Agreement by precluding Peak from selling Peak's IS4W product, by misrepresenting to Plaintiffs that Ebix would allow Peak to market and sell Ebix's BRIC's system, and by directing Peak employees to transfer any sales leads from current or potential customers regarding the BRIC's system to another division of Ebix.

50. The IS4W product was one of Peak's most critical products. It is a computer system used by insurance companies to support policy administration, track claims, and operate their businesses. Prior to closing, IS4W accounted for sales of approximately $2.4 million of Peak's sales annually. At the time of closing, Peak was in the process of creating the next generation of this system, which was a browser based policy administration system known as "IS 5.0".

51. Prior to the closing of the Agreement, Ebix represented to Plaintiffs that not only would Peak be permitted to sell the Peak IS4W system, but that Peak would also be permitted to sell Ebix's BRICs system.

52. The Ebix BRICs system is a competing policy administration system to Peak's IS4W system and to Peak's IS 5.0 system. Prior to the closing of the Agreement, Ebix represented that the BRICs system could serve all of Peak's current customers. Ebix also represented that BRICs was an "all lines" system, as opposed to a system which could only accommodate certain lines of business, and therefore could be marketed to a wide range of potential customers.

53. Prior to closing, Ebix represented that the BRICs system was superior in all respects to the IS4W system, and that Peak could sell this system to Peak's customers and potential customers in 2010.

54. Prior to closing, Ebix promised Plaintiffs that any sales by Peak, or sales to Peak's customers or customer leads, of the BRICs system would count towards the calculation of the Earn Out.

55. Plaintiffs relied on Ebix's representations, and signed the Agreement in reliance on Peak's representations regarding the IS4W and BRICs systems.

56. After the Agreement was signed, Ebix refused to allow Peak to sell the BRICs system or the IS4W system. Instead, Ebix directed that all leads regarding the BRICs system from current or potential customers be given to Ebix's Property & Casualty sales department.

57. After the Agreement was signed, Ebix also directed Peak employees to stop marketing the IS4W system, to stop developing the IS5.0 product and to direct all potential leads relating to this system to the Property & Casualty sales department of Ebix so that those customers could be contacted regarding the BRICs system. Ebix also greatly diminished the

{01130107.DOC;5 }    11

technical product support team for IS4W, which had the effect of preventing any additional sales of this system in the future.

58. After the Agreement was signed, Plaintiffs also learned that BRICs was not an all lines system. Instead, BRICs was only designed to apply to personal automotive insurance carriers, as opposed to all lines of commercial insurance. This meant that BRICs was not appropriate for substantially all of Peak's customer base, and that Peak would not be able to market BRICs to the wide range of potential customers represented by Ebix prior to closing.

59. After the Agreement was signed, Ebix refused to provide Peak employees with the source code for BRICs, which prevented Peak employees from making necessary changes and improvements to BRICs.

60. After the Agreement was signed, Ebix refused to provide Peak employees with access to the BRIC's system until well into the Earn Out Period. This refusal to provide access prevented Peak from marketing BRICs to potential customers.

61. As discussed above, Ebix has failed to provide either valid books and records or audited financial statements to date. As a result, Plaintiffs are currently unable to conclusively determine whether or not these breaches and fraudulent misrepresentations by Ebix have harmed Plaintiffs.

62. On information and belief, had Peak been given the opportunity to sell its IS4W system or the BRIC's system without interference by Ebix, or had Peak been permitted to finalize its development of IS5.0, Peak would have earned at least an additional $1,000,000 in revenue in 2010. As support for this position, during the year 2009 Peak received approximately $2.4 million in revenue related to its IS4W system. As a result of Ebix's interference in the sales, servicing and development of this program, IS4W revenue decreased to $1.5 million

during the Earn Out Period.

63. Peak also was prevented from selling the BRICs system, and would have had additional sales resulting from the sale of that system.

64. As evidence of the potential damages relating to Ebix's refusal to provide Peak with timely access to the BRICs system, soon after the Earn Out Period closed the BRICs system was sold to American Collectors Insurance under a contract creating over $2.4 million in revenue over 5 years. Had Peak been provided with timely access to BRICs and been allowed to market this system, this revenue may have been earned by Peak during the Earn Out Period with other policy administration software sales Peak could have won during 2010.

### C. Ebix Took Other Affirmative Actions Which Reduced Peak's Opportunity To Receive The Maximum Possible Earn Out.

65. As discussed in detail above, Ebix's termination of key employees, failure to correct repeated billing/accounting problems, inability to track customer payments, inability to track accounts receivable, and refusal to allow Peak to sell the IS4W and BRICs systems significantly reduced Plaintiffs' opportunity to receive the maximum potential Earn Out.

66. Another factor which significantly impacted Peak's opportunity to receive the maximum possible Earn Out was Ebix's inaccurate books and records and lack of internal payment controls. Ebix was consistently unable to manage its cash flow and track revenues and expenses. This failure to manage cash flow and track revenues and expenses significantly harmed Peak's ability to attract and maintain new business.

67. By way of example, Ebix was obligated to pay unemployment compensation premiums to the state of West Virginia. Ebix failed to make this payment, and as a result Peak was prohibited from doing business in West Virginia while the issue was resolved. This caused Peak to lose approximately $65,000 in revenue for 2010 from a long term customer of Peak, as

well as other opportunities in West Virginia.

68. As another example of Ebix's failure to manage cash flow and track revenues and expenses, in March of 2010 checks written by Ebix were returned for insufficient funds, including a check to one of the Plaintiffs.

## IV. Ebix Failed To Use Reasonable Efforts To Collect Accounts Receivable Owed To Plaintiffs.

69. Section 1.2(e) of the Agreement states that "All receivables of [Peak] relating to services performed by [Peak] through September 30, 2009 ("Pre-Closing Receivables") shall belong to the [Plaintiffs], even if such receivables are collected by [Ebix] or [Peak] after the Closing Date." This section further requires that "[Ebix] shall cause [Peak] to use commercially reasonable efforts to collect the Pre-Closing Receivables."

70. Peak's business is based on monthly subscription payments for services rendered. If customers do not pay the fee, they do not continue to receive the service. As a result, Peak has historically had almost no write-offs of accounts receivable.

71. Despite the obligation to maximize the collection of the Pre-Closing Receivables, after closing Peak experienced extraordinary write offs of accounts receivable well in excess of historical norms.

72. Ebix's failure to use commercially reasonable efforts to collect the Pre-Closing Receivables caused Peak to write off approximately $250,000 in Pre-Closing Receivables which belonged to Plaintiffs.

73. Ebix's also failed to use commercially reasonable efforts to collect the Pre-Closing Receivables in a timely manner, and failed to forward those payments to Plaintiffs in a timely manner. As a result, Plaintiffs did not receive the payments of the Pre-Closing Receivables until August of 2010, almost one year after closing.

74. As additional evidence of Ebix's inability to properly control accounts receivable or to collect the Pre-Closing Receivables, Ebix was unable to track which customers had paid the Pre-Closing Receivables or to explain why certain invoices were still outstanding. As a result of these accounting and collections problems, Ebix agreed to pay Plaintiffs the Pre-Closing Receivables on a calculated basis which estimated the Pre-Closing Receivables which would be received, rather than on the basis of the revenues actually received by Ebix as was anticipated in the Agreement.

### V. Ebix Caused Plaintiffs To Incur Substantial Tax Liability By Failing To Apply Ebix's Net Operating Losses To Peak's Profits After Closing.

75. The Agreement states that Ebix was responsible for preparing Peak's tax return for the year 2009, the last partial year which Plaintiffs owned Peak. See Agreement § 10.1(a). Even though Ebix was responsible for preparing Peak's tax return, Plaintiffs were obligated to pay any taxes relating to Plaintiffs' period of ownership. See Agreement § 10.1(c).

76. In negotiating the Agreement, Ebix and Plaintiffs discussed tax matters in detail. As Peak was a profitable company, the parties agreed that Ebix would apply certain of Ebix's net operating losses ("NOLs") to reduce Peak's tax burden.

77. Ebix failed to prepare Peak's 2009 tax return in a timely manner, requesting repeated extensions of time to prepare and file this return. Finally, in March of 2011, Ebix finally prepared and filed Peak's 2009 tax return. Upon information and belief, Ebix will be responsible for penalties and interest payments as a result of failing to file Peak's 2009 tax return in a timely manner.

78. In Peak's 2009 tax return, Ebix did not apply its NOLs to reduce Peak's taxable income, in violation of its promises made to induce Plaintiffs to enter into the Agreement.

79. If Ebix would have applied its NOLs to Peak's 2009 tax returns then Peak's tax

{01130107.DOC;5 }    15

burden would have been significantly reduced.

80. Plaintiffs relied on Ebix's promise to apply its NOLs to the 2009 tax liability when entering into the Agreement, and were damaged by Ebix's failure to perform as promised.

### COUNT ONE- Breach of Written Contract/Claim for Indemnification

81. Plaintiffs reallege and incorporate the foregoing paragraphs as if fully rewritten herein.

82. The Agreement evidences a written contract between Plaintiffs and Ebix.

83. Plaintiffs have fully performed their obligations under the terms of the Agreement.

84. Ebix has materially breached the Agreement by, among other things: (a) failing to provide audited financial statements for Peak for the Earn Out Period; (b) failing to maintain accurate books and records; (c) interfering with Plaintiffs' right to receive the Earn Out; (d) failing to use reasonable efforts to collect accounts receivable; (e) failing to apply NOLs to Peak's 2009 tax return; and (f) violating the express covenant of good faith and fair dealing contained in Section 1.2(d)(iv) of the Agreement.

85. Section 9.2(b) of the Agreement requires Ebix to indemnify Plaintiffs from all Loses which Plaintiffs may suffer arising out of "(b) any non-fulfillment or breach of any covenant or agreement on the part of Buyer or, on and after the Closing Date, the Company under this Agreement or the Transaction Documents."

86. Section 9.2(d) of the Agreement also requires Ebix to indemnify Plaintiffs from "any Losses resulting from any fraudulent misrepresentation by the Buyer contained herein or in any other Transaction Documents."

87. The Agreement defines Losses as "any and all liabilities, claims, actions,

assessments, losses, costs, damages, deficiencies, Taxes, fines or expenses (whether or not arising out of third-party claims), including, without limitation, interest, penalties, reasonable attorneys' fees and all amounts paid in investigation, defense or settlement of any of the foregoing, to the extent actually incurred (collectively, "Losses")." See Agreement § 9.1.

88. As a direct and proximate result of Ebix's breach of the Agreement and the fraudulent misrepresentations by Ebix, Plaintiffs have suffered and continued to suffer Losses as defined by the Agreement.

89. As a direct and proximate result of Peak's breaches of the Agreement, Plaintiffs have suffered damages in an amount to be proven at trial, but in excess of $75,000.

### COUNT TWO- Fraudulent Misrepresentation Fraudulent Inducement

90. Plaintiffs reallege and incorporate the foregoing paragraphs as if fully rewritten herein.

91. As discussed in detail above, prior to closing Ebix knowingly made several material affirmative fraudulent misrepresentations to Plaintiffs. These misrepresentations include, without limitation, that: (a) Peak would be permitted to sell the IS4W system after closing without interference by Ebix; (b) Peak would be permitted to sell the BRICs system after closing without interference by Ebix; (c) the Earn Out Calculation would include any sales of the BRICs system to Peak customers or Peak leads; (d) Ebix would apply its NOLs to Peak's 2009 tax return; (e) Ebix would maintain accurate books and records; (f) Ebix would operate Peak in a manner which would allow Plaintiffs to receive the maximum possible Earn Out; and (g) Ebix would allow Peak to retain key employees.

92. At the time Ebix made the aforesaid affirmative material factual misrepresentations to

{01130107.DOC;5 }  17

Plaintiffs, Ebix knew the representations to be false or acted with utter disregard and recklessness as to the falsity of these representations.

93. Ebix intended Plaintiffs to rely on Ebix's misrepresentations, and Ebix intended to mislead Plaintiffs by making these misrepresentations.

94. Ebix knew or should have known that Plaintiffs would rely on Ebix's misrepresentations.

95. Plaintiffs justifiably relied on the aforesaid representations by Ebix and in the absence of these representations would not have entered into the Agreement.

96. By making these material misrepresentations, Ebix acted intentionally in a willful, wanton, and/or reckless manner and fraudulently induced Plaintiffs to enter into the Agreement.

97. As a direct and proximate result of Plaintiffs' reliance on the aforesaid fraudulent misrepresentations, concealments, and inducements, Plaintiffs have suffered damages in an amount to be proven at trial, but in excess of $75,000.

WHEREFORE, Defendants demand judgment as follows:

(1)     On Count 1, Judgment in favor of Plaintiffs, and an award of damages in an amount to be proven at trial, but in excess of $75,000.

(2)     On Count 1, that Plaintiffs be awarded its attorneys fees incurred in prosecuting this action.

(3)     On Count 2, Judgment in favor of Plaintiffs, and an award of damages in an amount to be proven at trial, but in excess of $75,000.

(4)     On Count 2, that Plaintiffs be awarded its attorney fees incurred in prosecuting this action.

(5) That Plaintiffs be awarded costs and such other legal and equitable relief to which Plaintiffs may be entitled;

(6) That the Plaintiffs each be awarded pre- and post- judgment interest; and

(7) That Plaintiffs be awarded such other or further relief as may be just and equitable.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all issues so triable.

Respectfully submitted,

*/s/ Albert J. Lucas*
Albert J. Lucas (0007676)
TRIAL COUNSEL
N. Trevor Alexander (0080713)
Calfee, Halter & Griswold LLP
1100 Fifth Third Center
21 East State Street
Columbus, Ohio 43215-4243
alucas@calfee.com
talexander@calfee.com
TEL: (614) 621-1500
FAX: (614) 621-0010

*Attorneys for Plaintiffs*