**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**STEVEN R. ISSAC, ET AL.,**

**Plaintiffs**

**v.**

**EBIX, INC.,**

**Defendant.**

**Case No.: 2:11-cv-00450**

**Judge Graham**

**Magistrate Judge Abel**

**OPINION AND ORDER**

This matter is before the court on partial motion to dismiss, pursuant to Fed. R. Civ. P. 12(b)(6) filed by defendant Ebix, Inc. (Ebix). Defendant also moves for an order staying the case and compelling the plaintiff to proceed with dispute resolution. Finally, defendant moves for an order striking plaintiff's jury demand.

**I. Facts**

Plaintiffs are Steven R. Issac (Issac) an Ohio citizen, Earl Gallegos (Gallegos), a Florida citizen, and Richard Freeman (Freeman), an Arizona citizen (Plaintiffs). In 2009 the plaintiffs were the sole shareholders of a Delaware corporation called Peak Performance Solutions, Inc. (Peak) with its principal place of business in Orient, Ohio. Defendant is Ebix, Inc., a Delaware corporation with its principal place of business in the state of Georgia. Subject matter jurisdiction in this case is premised upon diversity under 28 U.S.C. § 1332.

On September 30, 2009 Plaintiffs entered into a Stock Purchase Agreement ("Agreement") with Ebix. In consideration for purchasing all of the outstanding capital stock of Peak, Ebix agreed to pay: 1) an initial purchase price of $8,000,000.00; 2) an Earn-Out based on

Peak's revenue during the calendar year of 2010, potentially ranging from $0-$1,500,000.00 ("Earn Out"); and 3) the value of accounts receivable owed to Peak as of September 30, 2009 ("Pre-Closing Receivables"). (Agreement ¶1.2).

Pursuant to the Earn Out provision of the Agreement, if Peak's revenues for 2010 were equal to or greater than $6,800,000.00, Ebix would pay the plaintiffs $1,500,000.00. (Section ¶1.2.(b)(I)). If the revenues were equal to or greater than $6,500,000.00 but less than $6,800,000.00, Ebix would pay the plaintiffs $1,000,000.00. (Section 1.2(b)(ii)). Any such Earn Out was to be paid within five business days following the completion of the audited financial statements for the Earn Out period, but in no event later than 90 days after the end of the Earn Out Period (December 30, 2010). Thus, any Earn-Out was required to be paid no later than March 31, 2011. Along with any Earn Out payment, Ebix was to provide: 1) a certificate setting forth in detail Ebix's calculation of the Earn Out; and 2) a copy of the Company's audited financial statements for the Earn Out Period. (Agreement 1.2.). Thus, the audited financial statements were also to be submitted no later than March 31, 2011.

The Agreement also contained a detailed plan for resolving any disputes over the Earn Out amount. Pursuant to the Agreement, Ebix would make available to plaintiffs, "copies of all work papers, documents, receipts, invoices, and other materials," and would grant Plaintiffs or their agent access to Ebix's personnel and outside auditors. If the plaintiffs contested Ebix's calculation of the Earn Out, they were to provide written notice within 30 days of receipt of the Earn Out Certificate. If the Plaintiffs did not timely deliver an Earn Out Contest Notice, then the Earn Out Certificate and calculation would be final and binding. During the 30 day period following any Earn Out Contest Notice, the parties would attempt a good faith resolution of their

differences. However, if no resolution could be reached, then the parties agreed to engage an "independent accountant" to review the disputed items and amounts as set out in the Earn Out Notice. Within sixty days, the independent accountant was to provide a calculation that would be "final and binding." (Section 1.2(c)).

The Agreement also contained provisions for maximizing plaintiff's Earn Out. In order to provide the plaintiffs with "a reasonable opportunity to receive the maximum Earn Out available," Ebix promised the following: 1) to retain plaintiff Steve Issac as head of the Buyer's division; 2) retain Peak employees Shane Garner and Matthew Abbit in positions substantially similar to the ones they were in pre-purchase; 3) refrain from diverting or causing any of Peak's current customers to do business with other entities controlled by Ebix; 4) to be under an express obligation of good faith and fair dealing; and 5) "not do anything to adversely affect the Sellers opportunities to receive the maximum Earn Out available." (Section 1.2(d)).

The Agreement also contained a provision granting all receivables of Peak relating to services performed by Peak up to September 30, 2009 ("Pre-Closing Receivables") to Peak regardless of whether the receivables were collected after the closing date. The Agreement contained numerous other provisions relating to the sale of the company, including an integration clause. Section 11.12 of the Agreement states in pertinent part:

> This Agreement, the Preamble and the Disclosure Schedule and Exhibits attached to this Agreement...set forth the entire understanding of the Parties with respect to the subject matter hereof and supercede all prior agreements, written or oral, of the Parties hereto, and shall not be modified or affected by any offer, proposal, statement or representation, oral or written, made by or for any party in connection with the negotiation of the terms hereof...

Although the Earn Out and audited financial statements were due to plaintiffs no later than March 31, 2011, Ebix failed to provide either by that date. On or about April 5, 2011,

plaintiffs requested a copy of Peak's audited financial statements. In response, on April 21, 2011, Ebix CFO Robert Keris emailed an Excel Spreadsheet to plaintiffs which purported to be the Earn Out calculation. No audited financial statement was provided at that time. Plaintiffs allege that Keris' Earn Out calculation was contradicted by statements provided by Ebix's Controller Sean Donaghy on December 16, 2010 and April 21, 2011.

On or about May 3, 2011, plaintiffs contacted Ebix informing it that it was in breach of the Agreement and again requested the audited financial statements. The audited financial statements were not delivered to plaintiffs until July 26, 2011. The audited financial statements provided yet a different statement of revenue results for Peak during the Earn Out period.

Plaintiff alleges that Ebix' failure to provide consistent information on the Earn Out revenues stems from the company's failure to maintain accurate records and accounting procedures. Plaintiff alleges that Ebix was unable to properly bill customers, track payments made to Peak, and failed to keep Peak's operations and accounting separate from Ebix during the Earn Out period. These failures, assert plaintiffs, resulted in Ebix being unable to provide accurate records from which an accurate Earn Out calculation could be made. Plaintiffs also allege that defendant breached its obligation to refrain from interfering with plaintiffs right to receive the Earn Out. Specifically, plaintiffs assert that Ebix took affirmative steps which all but guaranteed that plaintiffs would not receive an Earn Out, such as firing key Peak employees and failing to use reasonable efforts to collect the pre-closing receivables. In addition, plaintiffs allege that Ebix interfered with its ability to receive an Earn Out by misrepresenting that plaintiffs would be allowed to sell certain products during the Earn Out period and then refusing to allow them to sell those products once the Agreement had been signed. According to

plaintiffs, the inability to sell two key products – the Peak IS4W system and the BRIC system – resulted in a significant loss of revenue for Peak during the Earn Out period.

Finally, plaintiffs claim that Ebix's breach of contract resulted in significant tax liability for Peak. Pursuant to the Agreement, Ebix was responsible for preparing Peak's tax return for the year 2009, even though plaintiffs would be obligated to pay any taxes relating to plaintiffs' period of ownership during that year. As part of negotiations, Ebix agreed that it would apply certain of Ebix's net operating losses to reduce Peak's tax burden. This alleged agreement was not memorialized in the written contract. Ebix failed to prepare the tax return in a timely manner. When it finally did in March of 2011, Ebix did not apply its net operating losses to Peak's taxable income.

Plaintiff also makes a claim for fraudulent inducement, alleging that defendant made knowing misrepresentations in order to induce plaintiff into entering into the contract and that defendant had no intention of keeping those promises at the time they were made. Defendant now moves to dismiss Count II for fraudulent inducement pursuant to Fed. R. Civ. P. 12(b)(6). In addition, Ebix moves the court for an order compelling plaintiffs to proceed with the dispute resolution procedure set forth in the Agreement. Finally, defendant moves for an order striking the plaintiff's jury demand pursuant to Fed. R. Civ. P. 12(f).

## II. Legal Standard

This matter is before the court on the motion of defendant to dismiss the complaint pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim for which relief may be granted. In ruling on a motion to dismiss under Rule 12(b)(6), the court must construe the complaint in a light most favorable to the plaintiff, accept all well-pleaded allegations in the complaint as true,

and determine whether plaintiff undoubtedly can prove no set of facts in support of those allegations that would entitle him to relief. Erickson v. Pardus, 551 U.S. 89, 94 (2007); Bishop v. Lucent Technologies, Inc., 520 F.3d 516, 519 (6th Cir. 2008); Harbin-Bey v. Rutter, 420 F.3d 571, 575 (6th Cir. 2005). To survive a motion to dismiss, the "complaint must contain either direct or inferential allegations with respect to all material elements necessary to sustain a recovery under some viable legal theory." Mezibov v. Allen, 411 F.3d 712, 716 (6th Cir. 2005). Conclusory allegations or legal conclusions masquerading as factual allegations will not suffice. Id.

While the complaint need not contain detailed factual allegations, the "[f]actual allegations must be enough to raise the claimed right to relief above the speculative level," Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007), and must create a reasonable expectation that discovery will reveal evidence to support the claim. Campbell v. PMI Food Equipment Group, Inc., 509 F.3d 776, 780 (6th Cir. 2007). A complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." Twombly, 550 U.S. at 570. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Ashcroft v. Iqbal, 556 U.S. 662, 129 S.Ct. 1937, 1949 (2009). Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief. Id. Determining whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id. at 1950. Where the facts pleaded do not permit the court to infer more than the mere possibility of

misconduct, the complaint has not shown that the pleader is entitled to relief as required under Fed.R.Civ.P. 8(a)(2). Ibid.

Plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 555; see also Ashcroft, 129 S.Ct. at 1949 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."); Association of Cleveland Fire Fighters v. City of Cleveland, Ohio, 502 F.3d 545, 548 (6th Cir. 2007).

## III. Legal Analysis

### A. Choice of Law

In general, a federal court adjudicating a diversity action must apply the choice of law rules of the forum state. Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496, 61 S. Ct. 1020, 85 L. Ed. 1477 (1941). Section 11.8 of the Agreement includes a choice of law clause which provides in pertinent part that the Agreement "shall be construed and enforced in accordance with, and all questions concerning the construction, the [*sic*] internal laws of the State of Delaware." However, the parties cite to Ohio case law in support of their various positions. In order to determine whether Delaware or Ohio law governs, the court must undertake a choice of law analysis.

Section 6 of the Restatement provides, in pertinent part:

> (1) A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law.

Ohio has adopted the restatement of the law, choice of law. Morgan v. Biro Mfg. Co., Inc., 15 Ohio St.3d 339, 474 N.E.2d 286 (Ohio, 1984).

Ohio has also adopted Section 187 of the Restatement of Conflicts which provides that subject to very limited exceptions, "the law of the state chosen by the parties to a contract will govern their contractual rights and duties." See Ohayon v. Safeco Ins. Co., 747 N.E.2d 206, 209 (Ohio 2001)(citing Section 1897 of the Restatement of Conflicts). Because the parties do not oppose using Delaware law, and have clearly contracted for Delaware law to govern their contract dispute, the court finds that Delaware law applies to the breach of contract claim. However, "fraud claims derive from tort law, and thus, warrant a separate choice-of-law analysis than related claims for breach of contract." Wagner v. Mastiffs, Case Nos. 2:08-CV-00431, 2:09-CV-00172, 2010 U.S. Dist. LEXIS 23100 (citing Macurdy v. Love, 894 F.2d 818, 820 (6th Cir. 1990)).

Section 148 of the Restatement (Second) of Conflicts of Law governs choice-of-law for fraud claims and provides: "when the plaintiff's action in reliance took place in the state where the false representations were made and received, the local law of this state determines the rights and liabilities of the parties unless, with respect to the particular issue, some other state has a more significant relationship." Rest. 2d. Confl. § 148(1). In their complaint, plaintiffs allege that a significant number of the events at issue in the case took place in Ohio and that during all times relevant to the complaint, Peak Performance was located in Orient, Ohio. Defendant Ebix does not oppose the use of Ohio law to resolve plaintiff's fraudulent inducement claim. Accordingly, Ohio law will be applied to the fraudulent inducement claim.

**B. Fraudulent Inducement**

Count Two of the Complaint alleges that Ebix made the following material affirmative fraudulent misrepresentations:

1. Peak would be permitted to sell the IS4W system after closing without interference by Ebix;

2. Peak would be permitted to sell the BRICs system after closing without interference by Ebix;

3. the Earn Out Calculation would include any sales of the BRICs system to Peak customers or Peak leads;

4. Ebix would apply its NOLs to Peak's 2009 tax return;

5. Ebix would maintain accurate books and records;

6. Ebix would operate Peak in a manner which would allow Plaintiffs to receive the maximum possible Earn Out; and

7. Ebix would allow Peak to retain key employees.

According to the Amended Complaint, Ebix made these representations knowing them to be false at the time they were made and did so for the purpose of inducing the plaintiffs into entering the agreement. The plaintiffs allege that they justifiably relied on the representations and were damaged as a result. Defendant argues that the plaintiff cannot maintain a fraudulent inducement claim because the representations relied upon are barred by the parol evidence rule.

As an initial matter, "the existence of a contract action generally excludes the opportunity to present the same case as a tort claim." Wolfe v. Continental Cas. Co., 647 F.2d 705, 710 (6th Cir. 1981). Therefore, "Ohio courts have held that 'a tort claim based upon the same actions as those upon which a claim of contract breach is based will exist independently of the contract action only if the breaching party also breaches a duty owed separately from that created by the contract, that is, a duty owed even if no contract existed.'" Thornton v. Cangialosi, No. 2:09-CV-585, 2010 U.S. Dist. LEXIS 51818 (S.D. Ohio May 26, 2010)(quoting Textron Fin. Corp. v. Nationwide Mut. Ins. Co., 115 Ohio App.3d 137, 151, 684 N.E.2d 1261,

1270 (Ohio Ct. App. 1996)(internal citations omitted)). If the tort claim is "factually intertwined with the breach of contract claim," a plaintiff cannot pursue relief under both theories. Id.

The misrepresentations which the plaintiff relies on in alleging the fraudulent inducement claim are identical to the allegations made in the breach of contract claim. Specifically, plaintiffs allege that the defendant breached Section 1.2(d)(v) of the Agreement which provides that the defendant would "not do anything to adversely affect the Seller's opportunity to receive the maximum Earn Out available pursuant to this Agreement." Plaintiffs further allege that the defendants breached this section of the contract by precluding Peak from selling the IS4W and BRIC systems, by failing to include the sale of the IS4W and BRIC systems in the Earn Out calculation, by failing to keep valid books and records, (Complaint ¶51). Plaintiffs also allege as part of both the breach of contract and fraudulent inducement claim that the defendants failed to keep valid books and records. All of these factual allegations supporting the breach of contract claim are identical to the factual allegations supporting the fraudulent inducement claim[1]. The plaintiffs remaining factual allegations underlying their fraudulent inducement claim relate promises which are expressly included in the contract.

Regardless of whether the plaintiffs sufficiently articulated a fraudulent inducement claim, the real issue before the court is "whether such a claim is viable in light of the concurrent breach of contract claim." Thornton, 2010 U.S. Dist. LEXIS 51818, *10. The fact that the plaintiffs allege that defendant had no intention of keeping those promises when made cannot save the fraudulent inducement claim. See Id (citing Texlon Corp. v. Smart Media of Delaware,

---

[1] Whether the language of the contract relied upon by the plaintiffs might be considered ambiguous, and therefore expounded upon by parol evidence, is not an issue currently before the court.

Inc., Nos. 22098, 22099, 2005 Ohio 4931, stating fraudulent inducement cannot be maintained where "the alleged unfulfilled promise is not a collateral statement designed to induce contract formation, but rather, the promise upon which the purported breach of contract is premised."). Because plaintiffs fraudulent inducement claim and breach of contract claim are factually intertwined, the plaintiffs cannot maintain the fraudulent inducement claim. Accordingly, defendant's motion to dismiss the fraudulent inducement claim is granted.

**C. Dispute Resolution**

Defendant also moves for an order staying the case and compelling the plaintiffs to submit their dispute to the dispute resolution procedure outlined in the Agreement. Plaintiffs assert that the defendant failed to comply with the dispute resolution process and cannot now seek to enforce it. Plaintiffs also assert that the dispute resolution procedure set forth in the Agreement was limited to review only of the very narrow issue of the amount owed under the Earn Out provision.

The Agreement contained clear direction for how the plaintiffs' Earn Out would be calculated. Pursuant to the Agreement, the defendant was to provide a certificate setting forth in detail Ebix's calculation of the Earn Out along with audited financial statements for the Earn Out period. (Section 1.2(b)). If plaintiffs disputed the Earn Out calculation, then within thirty days of the receipt of this information, plaintiffs had to prepare an Earn Out Contest Notice. (Section 1.2. (c)). If the parties could not agree on the calculation of Earn Out, then the calculation was to be submitted to an independent accountant. (Section 1.2.(c)(iii)). The parties do not dispute that a contract provision delegating final and binding resolution of a dispute to an independent party may be considered an arbitration provision. See e.g., Omni Tech. Corp. v. MPC Solutions

Sales, LLC, 432 F.3d 797, 798 (7th Cir. 2005) (contract provision calling for final, binding decision by an independent accountant is treated as a binding alternative dispute resolution provision); McDonnell Douglas Finance Corp. v. Pennsylvania Power and Light Co., 858 F.3d 825, 830-31 (2d Cir. 1988)(agreement to appoint independent tax counsel is treated as an agreement to arbitrate); Holt Co. v. Ohio Machinery Co., No. 05AP-1280, 2007 Ohio 2870 (Ct. App. Ohio June 12, 2007)(agreement to refer dispute to an independent accountant treated as a dispute resolution provision).

The Agreement required the defendant to pay the Earn Out amount to plaintiffs within five business days of the completion of the audited financial statements for the Earn Out Period, but "in no event later than 90 days after the end of the Earn Out period." (Section 1.2.(b)). According to plaintiffs' complaint, the Earn Out period ended on December 31, 2010. Thus, the Earn Out payment had to be made on or before May 31, 2011. The defendants failed to provide an Earn Out certificate or audited financial statements until July 26, 2001. This was a clear failure to meet the requirements of the Agreement related to the Earn Out. Because the defendant did not perform its obligation under the contract, it cannot now require that the plaintiffs perform under the contract. See Klausing v. Chef Solutions, Inc., No. 1-07-34, 2007 Ohio 6014 (Ct. App. Ohio Nov. 13, 2007)(plaintiff could not be required to comply with the contract's arbitration provision for disputed payments when the defendant failed to provide timely payment calculations as required by the contract).

Moreover, before compelling arbitration, a court "must engage in a limited review to determine whether the dispute is arbitrable; meaning that a valid agreement to arbitrate exists between the parties and that the specific dispute falls within the substantive scope of that

agreement." Bratt Enters. v. Noble Int'l. Ltd., 338 F.3d 609, 612 (6th Cir. 2003). The Agreement's only reference to a dispute resolution procedure is found in Section 1.2 (c) under the section titled "Earn-Out Contest." The Agreement refers to a "dispute or disagreement relating to the determination of such Earn Out," (Section 1.2(c)(I)) and then goes on to state:

> If the Buyer and Sellers are unable to settle such dispute during such 30-day period, they shall engage an independent accountant reasonably satisfactory to Buyer and Sellers (the "Independent Accountant") to review the disputed item(s) and amount(s) as set forth in the Earn Out Contest Notice for the purposes of calculating the applicable Earn Out due hereunder.

The plain language of this section demonstrates that the parties agreed to submit disputes relating the "items" and "amounts" as set forth in the Earn Out Contest Notice, for the "purpose" of allowing the independent accountant to calculate the applicable Earn Out. The plaintiffs are not asking this court to review disputed items or amounts set out in the Notice or to calculate the applicable Earn Out owed. Rather, the plaintiffs are alleging that the defendants have breached the contract in a plethora of ways so as to prevent any reasonable Earn Out calculation as required by the contract. The court cannot compel the parties to submit matters to dispute resolution for which the parties did not agree to arbitrate. See, Bratt Enters., 338 F.3d at 613 (though the courts favor arbitration, the parties can only be ordered to arbitrate disputes that fall within the scope of their agreement). For this reason, the defendant's motion to compel arbitration and stay the matter pending arbitration is denied.

**C. Strike the Jury Demand**

Finally, the defendants move this court for an order striking plaintiffs' jury demand. Section 11.9 of the Agreement is entitled "Waiver of Jury Trial" and provides that the parties

"irrevocably waives any and all right to trial by jury of any claim or cause of action in any legal proceeding arising out of or related to this Agreement." (doc. 7-1, section 11.9).

Parties to a contract may agree to waive the right to a jury trial and such waiver is presumptively valid. . K.M.C. Co. v. Irving Trust Co., 757 F.2d 752, 755 (6th Cir. 1985). The party who objects to a jury waiver must demonstrate that such waiver was not made knowingly or voluntarily. Id. The plaintiffs did not respond to defendant's motion to strike the jury demand and have presented no evidence to demonstrate that the waiver is invalid. Accordingly, the court grants the defendant's motion to strike the jury demand.

**IV. Conclusion**

For the foregoing reasons, the court GRANTS defendant's motion to dismiss Count II (Fraudulent Inducement) of the plaintiffs' complaint. The court DENIES defendant's motion to compel arbitration and to stay the matter pending arbitration. The court GRANTS defendant's motion to strike the jury demand.

IT IS SO ORDERED.

S/ James L. Graham
James L. Graham
UNITED STATES DISTRICT COURT

Date: Mar. 26, 2012